# UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| _____ | | |
| UNITED STATES OF AMERICA, | ) | |
| STATE OF CALIFORNIA, | ) | Civil Action No.: 11-684 (RGA) |
| STATE OF FLORIDA, and | ) | |
| STATE OF NEW JERSEY, | ) | |
| | ) | |
| *ex rel*., PAUL DENIS, | ) | **FOURTH AMENDED** |
| | ) | **COMPLAINT** |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MEDCO HEALTH SOLUTIONS, INC., | ) | |
| and EXPRESS SCRIPTS HOLDING | ) | **DEMAND FOR JURY TRIAL** |
| COMPANY, | ) | |
| Defendants. | ) | |
| _____ | ) | |

## TABLE OF CONTENTS

I.  INTRODUCTION ............................................................... 1

    A.  Federal Law Claims ................................................ 1

    B.  State Law Claims ................................................... 2

II.  SUMMARY OF THE ALLEGATIONS ................................. 2

III.  JURISDICTION AND VENUE ........................................ 10

IV.  THE PARTIES............................................................... 12

V.  GOVERNING LAWS, REGULATIONS AND CODES OF CONDUCT .......... 13

    A.  The Federal False Claims Act....................................... 13

    B.  The State False Claims Acts ........................................ 15

    C.  Federal Government-Funded Health Assistance Programs ............ 15

        1)  Medicare ...................................................... 15

        2)  Medicaid ...................................................... 18

    D.  Applicable Provisions ............................................... 19

        1)  The Anti-Kickback Statute .................................... 19

        2)  Prohibitions Against Claims for Services that are Not Medically Necessary or are Otherwise False or Fraudulent ................. 20

    E.  State Government-funded Healthcare Plans ......................... 21

        1)  California ..................................................... 21

        2)  Florida ....................................................... 21

        3)  New Jersey .................................................... 21

VI.  SPECIFIC ALLEGATIONS............................................... 22

    A.  Medco and the Pharmacy Benefit Management Business .............. 22

    B.  Medco's Corporate Integrity Agreement and Rebate Agreements ........ 24

i

    C.  Medco's Fradulent Purchase Discount Scheme ............................................... 25

        1)  The Manipulation of the Corporate Integrity Agreement ................... 25

        2)  The AstraZeneca Agreements ............................................................. 28

        3)  At Medco's Request AstraZeneca Agreed to Conceal Rebates in Secret Agreements ............................................................................. 30

        4)  Medco's Actions Constitute Violations of the Anti-Kickback Statute and the False Claims Act ........................................................ 42

        5)  Medco's Actions Submitted in connection with Part D Violated the FCA ............................................................................................. 43

        6)  Medco's Actions In Connection With the RDS Program Violated the FCA ............................................................................................. 44

        7)  Medco's Actions Constitute Violations of the State False Claims Acts ................................................................................................... 45

    D.  Relator Paul Denis is an Original Source of Defendants' Purchase Discount Scheme ............................................................................................ 47

    E.  Damages Caused by Medco's Unlawful Scheme ........................................... 52

VII.    CLAIMS FOR RELIEF ........................................................................................ 54

    FIRST CAUSE OF ACTION ............................................................................... 54

    SECOND CAUSE OF ACTION .......................................................................... 54

    THIRD CAUSE OF ACTION .............................................................................. 55

    FOURTH CAUSE OF ACTION .......................................................................... 55

    FIFTH CAUSE OF ACTION ............................................................................... 56

    SIXTH CAUSE OF ACTION .............................................................................. 56

    SEVENTH CAUSE OF ACTION ........................................................................ 57

    EIGHTH CAUSE OF ACTION ........................................................................... 58

VIII.    DEMANDS FOR RELIEF ................................................................................... 59

    TRIAL BY JURY ................................................................................................. 60

On behalf of the United States of America, the State of California, the State of Florida, and the State of New Jersey, Plaintiff and Relator Paul Denis ("Relator") files this Fourth Amended *Qui Tam* Complaint[1] against Defendant Medco Health Solutions, Inc. and Express Scripts Holding Company (collectively "Medco" or "Defendants") and alleges as follows:

## I.   INTRODUCTION

### A.  Federal Law Claims

1.      This is an action to recover treble damages and civil penalties on behalf of the United States of America in connection with Medco's defrauding of the United States Government by seeking and accepting kickbacks in the form of undisclosed purchase discounts from drug manufacturers in violation of the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the "FCA"), and in violation of the Corporate Integrity Agreement ("CIA") entered into between Medco and the Office of Inspector General of the Department of Health and Human Services and the Office of Inspector General of the Office of Personnel Management, and failing to inform its clients of these undisclosed purchase discounts, thereby both defrauding those clients, and unlawfully inflating the payments made by the federal government under the Medicare Voluntary Prescription Drug Benefit Program ("Medicare Part D" or "Part D").

2.      Pursuant to the FCA, Relator seeks to recover, on behalf of the United States of America, damages and civil penalties arising from false or fraudulent claims that Defendants submitted or caused to be submitted to the United States Government, most significantly reimbursements or subsidies made by the Federal Government pursuant to Medicare Part D.

---

[1] Pursuant to the Court's Order dated January 5, 2017 (Doc. 110), Relator is amending the complaint to insert additional information and specificity about Defendants' fraud to clarify and make clear that these allegations have not been previously publicly disclosed, that Paul Denis is an original source of these allegations, that the fraudulent conduct has continued past 2010 and at least through 2014 when Relator is informed that Nexium went off patent, and that this is the first filed case involving these allegations.

**B.  State Law Claims**

3.      This is also an action to recover double and treble damages and civil penalties on behalf of the named States arising from the conduct of Defendant who:  (a) made, used or presented, or caused to be made, used or presented, certain false or fraudulent statements, records and/or claims for payment or approval to the States; and/or (b) made, used or caused to be made or used false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the States, all in violation of each State's respective false claims act or similar statute. The false or fraudulent claims, statements and records at issue involve payments made by health insurance programs funded by these State governments, including Medicaid.

4.      The statutes of the States under which Relator brings this action are the:

   a.      California False Claims Act, Cal. Govt. Code §§ 12651, *et seq.*;

   b.      Florida False Claims Act, Fla. Stat. Ann. §§ 68.081, *et seq.*; and

   c.      New Jersey False Claims Act, N.J. Stat. Ann. §§ 2A:32C-1, *et seq.*

## II.      SUMMARY OF THE ALLEGATIONS

5.      Medco has defrauded the Government by seeking and accepting kickbacks in the form of hidden discounts in confidential agreements from pharmaceutical manufacturers including the manufacturer AstraZeneca ("AZ") in exchange for favoring certain AZ drugs, failing to share those discounts with its clients, including Medicare Part D participants, and not abiding by the Defendant's Corporate Integrity Agreement ("CIA") with the United States Government.

6.      Medco's clandestine arrangement with AZ allowed it to retain hundreds of millions of dollars in manufacturer discounts which would otherwise have been shared with Medco's clients, including state and privately sponsored employer health care plans that receive

2

subsidies from the federal government under Medicare Part D, and Medicare Part D plan

sponsors ("Part D Plan Sponsors"), such as Medicare-Advantage prescription drug ("MA-PD")

plan sponsors, private prescription drug plan ("PDP") sponsors, and Employer Group Waiver

Plan ("EGWP") sponsors, to which the Government makes payments on behalf of participating

Part D beneficiaries.

7.     Medco Health Solutions has for decades been one of the largest Pharmacy Benefit

Management ("PBM") companies in the United States, with net revenues of $51.3 billion in

2008, $59.8 billion in 2009, $66 billion in 2010, and $70.1 billion in 2011.  In 2012, subsequent

to its merger with Express Scripts Inc. under the banner of Express Scripts Holding Company,

the combined company's 2012 revenue was $93.9 billion dollars.

8.      Pharmacy Benefit Managers contract with clients such as government entities,

health plans, employers, unions, and managed care organizations to administer pharmacy

benefits.  Services provided by PBMs include processing pharmacy claims, assisting with the

development of drug plan designs, developing formularies, negotiating rebates from

pharmaceutical manufacturers, and providing retail pharmacy networks and mail-order

pharmacies for clients.  State health plans and unions, such as those in California, Florida, and

New Jersey, contract with and utilize the pharmacy benefits provided by Medco and Express

Scripts.

9.     Medco's clients are mostly entities that provide prescription drug benefits to their

active and/or retired employees and their dependents, including public and private employers and

unions who participate in Medicare's Retirement Drug Subsidy program ("RDS"), pursuant to

which the Government subsidizes a portion of eligible participants' prescription drug costs.

Medco clients also include Part D Plan Sponsors, to which the Government makes payments on behalf of Part D beneficiaries.

10.     Medco also sponsors its own Part D prescription drug plans ("the Medco PDPs"), contracting with the Government to provide prescription drug benefits directly to Part D participants, as well as to certain EGWP Sponsors.  Additionally, Medco serves as an aggregating PBM, submitting claims on behalf of numerous other PBMs' Part D prescription drug plans.

11.     Medco administered services for over 65 million health plan beneficiaries and managed over 40 million prescriptions in 2010 alone.

12.     Between December 2003 and October 2006, Medco was involved in civil litigation with the United States in which it was accused of serious, intentional violations of federal law, including hiding rebates which it was contractually obligated to share with its customers, soliciting kickbacks from pharmaceutical manufacturers to favor those manufacturers' drugs, and destroying and canceling valid patient prescriptions.

13.     In October 2006, contemporaneous with three settlement agreements with the United States for false claims under the FCA, Medco entered into a Corporate Integrity Agreement ("CIA") with the Office of Inspector General of the Department of Health and Human Services and the Office of Inspector General of the Office of Personnel Management (collectively, "the OIG").

14.     During the course of the litigation and settlement negotiations, Medco was aware that the Government was particularly concerned about the numerous profit-seeking tactics Medco used to disguise and conceal rebates from pharmaceutical manufacturers to avoid its

4

obligations to pass them on to its customers.  It is in this context that Medco entered into the CIA.

15.      In pertinent part, under Section II.C.2(a) of the CIA, Medco is required to monitor and track all "focus arrangements," which term is defined as all arrangements under which "compensation or remuneration is received by Medco from or on behalf of a pharmaceutical manufacturer, including but not limited to, rebates, regardless of how categorized, market share incentives, commissions, fees under products and services agreements, fees received for sales utilization data and administrative or management fees."

16.      Importantly, this definition specifically excludes only limited situations involving "purchase discounts based upon invoiced purchase terms."

17.      Based on generally-accepted accounting definitions and industry practice, "purchase discounts," are relatively small discounts provided based on the timing or manner of invoice payment, such as discounts for prompt payment or payment  in cash.  As a result, typical purchase discounts received by a PBM are not normally sought by or directly passed on to the PBM's clients, because such discounts are by definition based solely on the manner in which the PBM pays manufacturer invoices, are unrelated to a PBM's formulary or coverage review activities, and because such discounts are typically very small, *e.g.* less than two percent (2%).

18.      "Rebates," on the other hand, are significant price reductions and are customarily based on the dispensed volumes of a manufacturer's product within a PBM's client formularies, *i.e.,* lists of preferred prescription products, (known as formulary, base or access rebates), and may include additional manufacturer payments for increasing a product's market share, (known as incentive or market share rebates), all of which are shared with a majority of a PBM's clients.

19.     The definitional exclusion requested by Medco for "purchase discounts based on invoiced purchased terms" was understood and intended by the Federal Government to address the customary industry invoice-payment practices described above, and was not intended to exclude more substantial, performance-based discounts which are in substance rebates.

20.     Relator is a former Vice President of Pharmaceutical Contracting for Medco, where he worked for over 15 years and performed audits and administered all pharmaceutical contracts until his job responsibilities moved to an exclusive focus on manufacturer agreements and Medicare.

21.     Relator became familiar with the "purchase discount" exception language as a part of his CIA compliance training in early 2007.

22.     Relator learned while at Medco that Medco knowingly inserted the purchase discount exclusion into the CIA to allow it to utilize a new means of deceptive practices to disguise the rebates it received from manufacturers as purchase discounts thereby circumventing the requirements of the CIA.  In particular, Medco knew it had recently created agreements with AZ pursuant to which rebate payments were intentionally mischaracterized as purchase discounts.

23.     Starting in or about early 2005, Medco engaged in negotiations to revise agreements with AZ to purchase a number of AZ drugs, including the blockbuster acid-reflux medication Nexium and high-blood-pressure drug Toprol-XL.  However, Relator, who was responsible for tracking rebates, became aware that Medco requested that price reductions be artificially divided between separate agreements.  The primary agreements were drawn up as 'typical' rebate agreements for retail and mail-order dispensing (the "AZ Rebate Agreements"), and the secondary agreements, the "discount" agreements, were limited to Medco's mail-order

6

pharmacy purchases of Nexium and Toprol-XL (the "AZ Discount Agreements") (collectively, the "AZ Agreements").

24.     The first AZ Agreements for Nexium (the "AZ Nexium Agreements") were executed in or about November of 2005, and the AZ Agreements for Toprol-XL (the "AZ Toprol-XL Agreements") were executed in or about January of 2007.

25.     Relator had personal knowledge of this scheme as a copy of the 2005 AZ Nexium Agreement was formally distributed to him as part of a distribution list.  Also, as part of his job at Medco, Relator was required to review and be familiar with such agreements.  Moreover, as set forth herein, Relator had numerous conversations with other senior executives at Medco concerning the AZ Nexium Agreement.

26.     The AZ Discount Agreements, both facially and in practice, were not purchase discounts based on invoiced purchase terms, but were rebates based on formulary placement, just like the other rebates provided for in the companion AZ Rebate Agreements.

27.     Medco disclosed the AZ Rebate Agreements to the Government under the CIA, and to Medco clients to whom it was contractually obligated to disclose such agreements. However, based on Relator's knowledge of Medco's practices, Medco did not disclose the AZ Discount Agreements to the Government or to those clients, including its clients that are state run healthcare plans and unions, treating the discounts provided therein as purchase discounts, when they were in fact rebates given in exchange for formulary placement and the lock-out of competing drugs.

28.     Relator was aware that Medco tracked purchase discounts internally in many respects as if they were rebates because they had been rebates that were carved off so they could benefit Medco's margin and not be shared with clients.  Until Relator disclosed this scheme to

the Government, details that had never been revealed publicly by anybody, the Government was

not on the trail of the fraud.

29.     In or about January 2007, merely three months after signing the CIA, Medco both

renewed the AZ Agreements for Nexium, and executed the AZ Agreements for Toprol-XL.

30.     Medco publicly proclaims that it "reduce[s] drug costs for [its] clients primarily

through programs that . . . drive competitive discounts from brand-name . . . pharmaceutical

manufacturers, including rebates from brand-name pharmaceutical manufacturers." (*See, e.g.,*

Medco 2010 Form 10-K Annual Report at 1).  In reality, Medco has also been improperly *hiding*

significant rebates from its clients.

31.     Medco received hundreds of millions of dollars in increased profits from the AZ

Discount Agreements, which should have otherwise been transparent and made available via

customary rebate sharing arrangements to most of Medco's clients, including state and privately

funded health plans receiving Government subsidies, Part D Plan Sponsors, state run healthcare

plans and unions, and Medco PDP members on behalf of whom the Government makes

payments directly to Medco.  Indeed, state run healthcare plans and unions specifically contract

for transparency and the complete pass-through of rebates.

32.     A significant portion of the relevant AZ mail-order drug purchases are utilized in

prescriptions dispensed to retiree beneficiaries enrolled in plans that receive RDS program

subsidies, to Part D beneficiaries enrolled in Part D Plans, and to members of state run healthcare

plans and unions.

33.     Medco's knowing concealment and failure to disclose the AZ Discount

Agreements materially and adversely affected its RDS clients, Part D Plan Sponsor clients, and

state run healthcare plan and union clients because they would have been entitled to receive

additional formulary rebates for the drugs covered by the AZ Discount Agreements, without taking additional formulary/coverage actions to earn such discounts, and because the undisclosed discounts were significant.

34.     Despite its internal anti-fraud training programs required by its CIA and its compliance, fraud, waste and abuse programs that were implemented to comply with the rules for pharmaceutical services companies providing services related to Medicare prescription drug benefits, Medco deliberately concealed the AZ Discount Agreements even though it knew, or should have known, that those discounts would effectively increase RDS and Part D Plan payments, and increase costs paid by state run healthcare plans and unions, and thus defraud the state and federal governments.

35.     Medco violated the terms of the CIA, or, at the very least, blatantly subverted its intent, by mischaracterizing the rebates under the AZ Discount Agreements as discounts, rather than rebates, in order to avoid the CIA's tracking, monitoring and reporting requirements.

36.     Medco intentionally avoided informing the Federal Government, as well as states, private employers, unions and health plan administrators, of the true price being paid by Medco for the relevant AZ drugs, thus engaging in deceptive and fraudulent in violation of the CIA, which was imposed upon Medco for other deceptive and fraudulent conduct.

37.     Further, and as described more fully herein, Medco violated the federal False Claims Act and state False Claims Acts by engaging in fraudulent and deceptive sales and business practices, soliciting and receiving what amounted to under-the-table kickbacks from AZ, and knowingly presenting, and/or causing to be presented, to the state and federal governments false claims for payment and/or false certifications material to those payments.

38.     This resulted in the Federal Government paying greater RDS subsidies and Part D

Plan related payments for the secretly-discounted drugs, and/or reimbursing or subsidizing drugs

for which the Government would not have made any payments had it known that the decision

making process with respect to the purchase of such drugs was tainted by violations of the Anti-

Kickback Statute.  These damages to the Federal Government – and the taxpayers – accounted

for millions of dollars of damages annually to the Federal fisc.

39.     This also resulted in state healthcare plans and unions paying more for pharmacy

benefits for the secretly-discounted drugs for which they would not have made any payments had

they known of the secret rebates and that the decision making process with respect to the

purchase of such drugs was tainted by kickbacks.

## III.     JURISDICTION AND VENUE

40.     Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the subject matter

of this civil action because it arises under the laws of the United States, in particular the False

Claims Act, 31 U.S.C. § 3729 *et seq*.

41.     In addition, the FCA specifically confers jurisdiction upon United States District

Courts under 31 U.S.C. § 3732.  This court has personal jurisdiction over Defendant pursuant to

31 U.S.C. § 3732(a) because Defendant is incorporated in Delaware and transacts business in the

District of Delaware.

42.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because certain of

the acts complained of herein occurred in or affected the District of Delaware.

43.     This Court has personal jurisdiction over Defendant pursuant to 31 U.S.C. §

3732(a) because the False Claims Act authorizes nationwide service of process and Defendant

has sufficient minimum contacts with the United States of America.

10

44.     In accordance with 31 U.S.C. § 3730(b)(2), the Second Amended Complaint and the earlier complaints were filed *in camera* and remained under seal for a period of at least 60 days and were not served on the Defendants until the Court so ordered.

45.     Also, in accordance with N.J.S.A. § 2A:32C-5(c), Cal. Gov't. Code § 12652(c)(2), and Fla. Stat. Ann. § 68.083(2)-(3), the Second Amended Complaint and the earlier complaints were filed *in camera* and remained under seal for a period of at least 60 days and were not served on the Defendants until the Court so ordered.

46.     Pursuant to 31 U.S.C. § 3730(b)(2), the Relator must provide the Government with a copy of the Complaint and/or a written disclosure of substantially all material evidence and material information in his possession contemporaneous with the filing of the Complaint. Relator has complied with this provision by serving copies of this Fourth Amended Complaint upon the Honorable Charles M. Oberly, III, United States Attorney for the District of Delaware, and upon the Honorable Sally Q. Yates, Acting Attorney General of the United States.  Since his first disclosure in 2009, Relator has provided substantially all material evidence and material information in his possession to the Office of the United States Attorney for the District of New Jersey and the District of Delaware.  Relator is also serving this Fourth Amended Complaint on the Attorneys General for the States of California, Florida, and New Jersey.  Relator has also provided substantially all material evidence and material information in his possession to the Attorneys General for the States of California, Florida, and New Jersey

47.     Relator is not aware that the allegations in this Complaint have been publicly disclosed.  Further, to the extent Relator is aware of any public disclosures, this Complaint is not based on such public disclosures.  In any event, this Court has jurisdiction under 31 U.S.C. § 3730(e)(4) because the Relator is an "original source" because he has provided his information

11

voluntarily to the Government before filing this Complaint, and has knowledge which is both

direct and independent of any public disclosures to the extent they may exist.

## IV.    THE PARTIES

48.    Relator, Paul Denis, is a former Vice President of Pharmaceutical Contracting for

Medco, where he worked for over 15 years as a high-level employee specializing in

pharmaceutical contracting and in that capacity became familiar with all aspects of Medco's

pharmaceutical contracting business. Relator received his MBA from the University of

Wisconsin in 1982 and he currently resides in Wisconsin.

49.    Relator was hired by Medco in 1992 as a Director of Special Drug Purchasing, a

title which was later changed to Director of Pharmaceutical Contracting.  In 1995, Relator was

promoted to Vice President of Pharmaceutical Contracting, a position in which he remained until

becoming a Vice President in Employer Sales in 2007.

50.    During his tenure at Medco, Relator administered and negotiated contracts with

pharmaceutical companies, solicited pharmaceutical company rebates and discounts, managed

accounts receivable, and developed contracts for Medicare Part D.  In 2005, Relator negotiated

the first arms length agreement between Medco and its former parent, Merck & Company

("Merck").

51.    Relator left Medco in November 2008.  Relator consistently received outstanding

performance reviews during his employment, including numerous special recognitions and

bonuses.

52.    From his employment at Medco, Relator gained direct, personal and independent

knowledge of pharmaceutical pricing and discounts, including those described herein.

53.     Relator is an original source and has direct, personal and independent knowledge of the information upon which the allegations herein are based.

54.     Founded in 1983, and headquartered in Franklin Lakes, NJ, Medco Health Solutions was purchased by pharmaceutical giant Merck & Co. in November 1993, and was operated by Merck as an independent subsidiary until it was spun off as a separate publicly traded company in August 2003.

55.     On July 20, 2011, Medco Health Solutions entered into a merger agreement with Express Scripts, Inc. ("ESI").  On April 2, 2012, the merger was completed and ESI and Medco Health Solutions were combined as subsidiaries of a new holding company, Express Scripts Holding Company.

56.     Medco Health Solutions provides drug benefit services to approximately 65 million people and is one of the largest PBMs in the United States.  Medco Health Solutions' mail-order pharmacy is the industry's largest pharmacy based on the quantity of prescriptions dispensed.

57.     In 2010, Medco Health Solutions managed 740 million prescriptions, including 109.8 million prescriptions dispensed through its mail-order pharmacies.  Medco Health Solutions' 2010 net revenues were $66 billion, and its net revenues were $70.1 billion in 2011.

58.     Headquartered in St. Louis, Missouri, Express Scripts is now the largest PBM company, managing more than a billion prescriptions each year.  Express Scripts' 2012 revenue was $93.9 billion dollars.

## V.     GOVERNING LAWS, REGULATIONS AND CODES OF CONDUCT

### A.     The Federal False Claims Act

59.     Originally enacted in 1863, the FCA was substantially amended in 1986 by the

13

False Claims Amendments Act.  The 1986 amendments enhanced the Government's ability to recover losses sustained as a result of fraud against the United States.  Further clarifying amendments were adopted in May 2009 and March 2010.

60.     The FCA imposes liability upon any person who "knowingly presents, or causes to be presented [to the Government] a false or fraudulent claim for payment or approval"; or "knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim"; or "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(A), (B), (G).  Any person found to have violated these provisions is liable for a civil penalty of up to $11,000 for each such false or fraudulent claim, plus three times the amount of the damages sustained by the Government.

61.     Significantly, the FCA imposes liability where the conduct is merely "in reckless disregard of the truth or falsity of the information" and further clarifies that "no proof of specific intent to defraud is required." 31 U.S.C. § 3729(b)(1).

62.     The FCA also broadly defines a "claim" as one that includes "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that – (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government – (i) provides or has provided any portion of the money or property requested or demanded; or (ii) will reimburse such contractor,

14

grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A).

63.     The FCA empowers private persons having information regarding a false or fraudulent claim against the Government to bring an action on behalf of the Government and to share in any recovery.  The complaint must be filed under seal without service on any Defendant. The complaint remains under seal while the Government conducts an investigation of the allegations in the complaint and determines whether to intervene in the action. 31 U.S.C. § 3730(b).

64.     The payment or receipt of kickbacks by or from a party which seeks reimbursement from a federal government health program, or causes another party to seek such reimbursement, while certifying or impliedly certifying compliance with the Anti-Kickback Statute, or causing another party to do so, constitutes a violation of the FCA.

**B.      The State False Claims Acts**

65.     This action is also filed on behalf of several states with False Claims Acts that closely track the Federal FCA:  the California False Claims Act, Cal. Govt. Code §§ 12650, *et seq.*; the Florida False Claims Act, Fla. State. Ann. §§ 68.081, *et seq.*; and the New Jersey False Claims Act, N.J. Stat. Ann. §§ 2A:32C-1, *et seq.*

**C.  Federal Government-Funded Health Assistance Programs**

**1)      Medicare**

66.     Medicare is a federal government-funded medical assistance program, primarily benefiting the elderly, that was created in 1965 when Congress enacted Title XVIII of the Social Security Act, ("Title XVII"), 42 U.S.C. § 1395 *et seq.*  Medicare is administered by the federal Centers for Medicare and Medicaid Services ("CMS"), which is a division of the U.S.

15

Department of Health and Human Services ("HHS").  Since 2006, Medicare Part D has provided

optional prescription-drug coverage to persons eligible for Medicare coverage.

67.     The Medicare Prescription Drug, Improvement, and Modernization Act of 2003

(MMA) amendment to Title XVIII created the Part D Voluntary Prescription Drug Benefit

Program which, as of January 1, 2006, added certain prescription drug benefits, covered by Part

D prescription drug plans and employment-based "qualified retiree prescription drug plans," to

the benefits covered under Medicare.  *See* 42 U.S.C. §§ 1395w-101, 1395w-132; 42 C.F.R. §

423.882.

68.     Under the MMA, eligible Medicare Part D beneficiaries can obtain prescription

drug coverage through private Part D prescription drug plans.  Potential Part D Plan Sponsors,

including Medco and other PBMs, submit bids annually to CMS  in order to participate in the

Part D program.  42 C.F.R. § 423.265.  CMS reviews and approves these bids, and Part D Plan

Sponsors then enter into direct contracts with CMS to provide drug benefits to Part D

participants.

69.     CMS makes prospective payments to Part D Plan Sponsors based on estimated

costs.  These include monthly direct subsidy premium payments for each Part D enrollee based

on the plan's approved bid amount, reinsurance payments for eighty percent (80%) of the Plan

Sponsor's costs for catastrophic coverage for Part D enrollee's above a certain threshold, and

low-income subsidy ("LIS") payments for premium and cost-sharing charges for low income

individuals.  Part D Plans, in turn, provide CMS with documentation of their actual costs.

70.     Following the close of the benefit year, CMS reconciles a Part D Plan Sponsor's

actual incurred prescription drug costs against the Plan Sponsor's bid.  If the Plan Sponsor's

actual costs exceed estimated costs, the Sponsor may be able to recoup some of its costs through

a risk-sharing arrangement with CMS.  If a Part D Plan Sponsor's estimated costs exceed its actual costs, the Sponsor may have to pay back some of  the payments made to it by CMS.

71.     Part D Plan Sponsors are required to make a number of significant and material certifications to CMS regarding the submission of data used for payment.  *See, e.g.*, 42 C.F.R. § 423.505(k) *et seq.*

72.     Notably, all "direct or indirect remuneration" from pharmaceutical manufacturers, regardless of whether the remuneration is properly retained by the PBMs, or is passed-through to their clients, is specifically excluded from coverage under the regulations for Part D Plan Sponsors. § 423.308 *et. seq.*

73.     Through the MMA's Retiree Drug Subsidy program, CMS contracts with employers or unions offering "qualified retiree prescription drug coverage" to their Medicare-eligible retirees ("RDS Plan Sponsors"), and provides a subsidy for a portion of their retiree drug costs between specified levels.

74.     The RDS subsidy can be claimed for each person enrolled in the employer's plan who would otherwise be enrolled in Medicare Part D.  The subsidy is equal to 28% of "allowable retiree costs," meaning the part of prescription drug costs that are actually paid by the employer or the retiree, net of any discounts, rebates or similar price concessions. 42 U.S.C. § 1395w–132.

75.     Potential RDS Plan Sponsors must submit an application for each year in which they plan to request a subsidy.  Plan Sponsors elect a payment frequency during the application process, and may make as many as twelve interim payment requests per plan year. 42 CFR § 423.888(b)(1).  RDS Plan Sponsors or their representatives, such as PBMs acting on their behalf, must submit cost data to CMS' RDS Center before submitting any interim payment requests. Those plans which have elected to only receive payments annually must submit cost data at the

17

time of reconciliation.  42 CFR § 423.888(b)(2).

76.     Following the close of the benefit year, CMS reviews the total gross covered retiree prescription drug costs and actual cost adjustments, such as those related to manufacturer price concessions, submitted by the RDS Plan Sponsor after the plan year has ended, and makes a final subsidy payment determination.  42 CFR § 423.888(b)(4).  CMS then reconciles the sum of any payments made to the RDS Plan Sponsor with its final subsidy payment determination, and if the sum of the interim payments made is larger than the final subsidy payment determination, will initiate an overpayment recovery action.

77.     In order to receive a subsidy payment, RDS Plan Sponsors must specifically accept and agree to certain terms, including acknowledging, and requiring all subcontractors to acknowledge, that information being provided in connection with the RDS application or subcontract, is being used for the purpose of obtaining federal funds.  *See, e.g.*, 42 C.F.R. § 423.884(c)(3).

        2)      **Medicaid**

78.     The Medicaid program was created in 1965 when Congress enacted Title XIX of the Social Security Act to expand the nation's medical assistance program to cover the medically needy aged, the blind, the disabled, and needy families with dependent children.  42 U.S.C. §§ 1396-1396v.  The Medicaid program is funded by both federal and state monies, (collectively referred to as "Medicaid Funds"), with the federal contribution computed separately for each state.  42 U.S.C. §§ 1396b; 1396d(b).  At the federal level, Medicaid is administered by CMS.  Medicaid is used by 49 states, each of which has a state Medicaid agency to administer the program.

79.     Each state is permitted, within certain parameters, to design its own medical

18

assistance plan, subject to approval by the HHS.  Among other forms of medical assistance, the

states are permitted to provide medical assistance from the Medicaid Funds to eligible persons

for inpatient and outpatient prescription drugs.  42 U.S.C. §§ 1396a(10)(A); 1396d(a)(12).

80.     Federal law prescribes that drug manufacturers must pay rebates to the states to

insure that the Medicaid Rebate Program is paying the lowest price the manufacturer sells a

covered outpatient drug to any purchaser in the United States, inclusive of cash discounts, free

goods, kickbacks, volume discounts and rebates.

**D.  Applicable Provisions**

       **1)     The Anti-Kickback Statute**

81.     The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, renders it impermissible for

anyone to solicit or receive kickbacks related to goods or services for which payment may be

made, in whole or in part, pursuant to a Federal health care program.

82.     The Anti-Kickback Statute defines "illegal remuneration" (*i.e.*, kickbacks) as:

> (1) whoever knowingly and willfully *solicits or receives* any remuneration
> (including any kickback, bribe, or rebate) directly or indirectly, overtly or
> covertly, in cash or in kind –
>
>     * * *
> (B)  in return for purchasing, leasing, ordering, or arranging
> for or recommending purchasing, leasing, or ordering any
> good, facility, service, or item for which payment may be
> made in whole or in part under a Federal health care
> program,
>
>     * * *
> (2) whoever knowingly and willfully *offers or pays* any remuneration
> (including any kickback, bribe, or rebate) directly or indirectly, overtly or
> covertly, in cash or in kind to any person to induce such person –
>
>     * * *
> (B)  to purchase, lease, order, or arrange for or recommend
> purchasing, leasing, or ordering any good, facility, service, or
> item for which payment may be made in whole or in part

19

under a Federal health care program,

42 U.S.C. § 1320a-7b(b) (emphasis added).  The offense is a felony punishable by fines of up to

$25,000 and imprisonment for up to five years.  42 U.S.C. § 1320a-7b(b).

83.     The Anti-Kickback Statute contains statutory exceptions and regulatory "safe

harbors" excluding certain types of conduct from liability.  See 42 U.S.C. § 1320a-7b(b)(3) and

42 C.F.R. § 1001.952.  None of these statutory exceptions or regulatory safe harbors applies to

Defendants' conduct in this matter.

84.     The Medicare and Medicaid Patient and Program Protection Act of 1987

authorizes the exclusion of an individual or entity  from participation in the Medicare and

Medicaid programs if it is determined that the party has violated the Anti-Kickback Statute.  In

addition, the Balanced Budget Act of 1997 imposed administrative civil monetary penalties for

Anti-Kickback Statute violations: $50,000 for each act and an assessment of not more than three

times the amount of remuneration offered, paid, solicited or received, without regard to whether

a portion of such remuneration was offered, paid, solicited or received for a lawful purpose.  *See*

42 U.S.C. § 1320a-7a(a)(7).

85.     The Government has deemed such misconduct to be material to its decision to pay

healthcare claims, in part through its requirement that providers certify compliance with this law

as a condition of payment under, and participation in, Government healthcare programs.

**2)      Prohibitions Against Claims for Services that are Not
Medically Necessary or are Otherwise False or Fraudulent**

86.     Federal law prohibits a person from knowingly presenting or causing to be

presented to Medicare or Medicaid a claim for a medical or other item or service that the person

knows or should know was "not provided as claimed," a claim for such items or services that is

"false or fraudulent," or a claim that is "for a pattern of medical or other items or services that

20

[the] person knows or should know are not medically necessary." 42 U.S.C. §§ 1320a-7a(a)(1)(A), (B) & (E).  Violation of this section is subject to a civil monetary penalty of $10,000 for each item or service, plus damages measured as three times the amount of each claim submitted, and exclusion from further participation in the programs.

**E.  State Government-funded Healthcare Plans**

        1)      **California**

87.      In California, for example, the California Public Employees' Retirement System (CalPERS) manages pension and health benefits for California public employees, retirees and their families.  Medco managed the pharmacy benefits for CalPERS members from 2006 through 2011, when CalPERS decided not to renew Medco's contract based on evidence of  misconduct related to Medco's solicitation of its original contract with CalPERS.

        2)      **Florida**

88.      In Florida, for example, Florida's State Group Insurance Program provides health benefits for salaried employees, eligible dependents and retirees.  Express Scripts/Medco is the pharmacy benefits manager for the State Group health insurance plans (except the CHP Retiree Advantage plan and the FHCP Medicare Advantage plan).

        3)      **New Jersey**

89.      In New Jersey, for example, the New Jersey State Health Benefits Program (SHBP) and the School Employees' Health Benefits Program (SEHBP) offer medical and prescription drug coverage to qualified public employees, retirees, and eligible dependents.  The prescription drug plans of the SHBP and SEHBP are administered by Medco/Express Scripts.

## VI.     SPECIFIC ALLEGATIONS

### A.     Medco and the Pharmacy Benefit Management Business

90.     One of the most significant trends in the health care industry in the late 1980s and early 1990s was the rise of Pharmacy Benefit Managers.

91.     In the 1980s, PBMs and their precursors provided mail order pharmacy services and prescription claims processing for employers.  In the early 1990s, with the growth of Health Maintenance Organizations (HMOs), PBMs' power and influence in the health care industry increased exponentially.  HMOs, seeking to create efficiencies of scale and save healthcare dollars by establishing drug formularies, partnered with PBMs to obtain discounts on medications from drug manufacturers due to the volume and market share that inclusion on formularies could drive.  These arrangements also encouraged (or required) doctors to prescribe and pharmacists to fill favored medications for HMO patients.

92.      During the 1990s, several large pharmaceutical companies acquired PBMs in an effort to increase their market share by controlling the drugs to be included on (and excluded from) PBM formularies and promoted by PBMs to pharmacists and prescribing physicians. However, after regulators required that PBM formulary decisions remain independent of their parent drug companies, many manufacturers divested their PBMs.

93.     Beginning in January 2006, with the establishment of the new Part D Voluntary Prescription Drug Benefit Program, PBMs were able to extend their business to the Medicare population.  Under the Part D program, beneficiaries have the option of joining Part D prescription drug plans which pay for those beneficiaries' pharmaceuticals and which, in turn, get reimbursed by Medicare.  Many of these plans use PBMs to obtain medications and set drug formularies.

94.     In addition, through the RDS program, Medicare eligible retirees can remain in state or private employer-sponsored drug plans which receive federal subsidies under Part D, as an alternative to participating in a Part D prescription drug plan.  These employer-sponsored drug plans also use PBMs to obtain medications and set drug formularies.  A significant portion of Medco's AZ mail-order drug purchases involve retiree beneficiaries enrolled in plans receiving RDS program subsidies.

95.     PBMs have also been able to extend their business to the Medicare population by contracting directly with CMS to themselves serve as Part D Plan Sponsors, providing pharmacy benefits directly to Medicare beneficiaries and to EGWP Sponsors which have elected to purchase their EGWPs from a PBM.

96.     In January 2006, the three largest independent PBMs, Medco Health Solutions, Caremark, and ESI, were processing prescription benefits for over 150 million people and generating combined revenues of $89 billion. In 2010, over 350 million Americans nationwide received drug benefits administered by PBMs, with the three largest representing well over 200 million lives.  Today Express Scripts Holding Company covers approximately 137 million lives, and commands over a third of the market.

97.     Over the past several years, PBMs have come under increased scrutiny and have been the subject of lawsuits by federal and state governments, health plans, employers, unions and individuals for, among other things, failing to disclose secret discounts to clients, manipulating formularies to favor drug companies who offer them kickbacks, recommending drug coverage exclusions that benefited the sales of higher margin drugs, and improperly switching patients' prescriptions from those originally prescribed by their physicians to drugs manufactured by companies from which the PBMs were receiving payments, regardless of

23

whether or not those drugs were most appropriate for the patients, or were even the most cost effective for their insurers.

**B. Medco's Corporate Integrity Agreement and Rebate Agreements**

98.     Between December 2003 and October 2006, Medco was involved in civil litigation with the United States in which it was accused of serious, intentional violations of federal law, including hiding rebates which it was contractually obligated to share with its customers, soliciting kickbacks from pharmaceutical manufacturers to favor those manufacturers' drugs, and destroying and canceling valid patient prescriptions.

99.     In October 2006, Medco entered into a CIA with the OIG.  The CIA was contemporaneous with three settlement agreements with the United States for claims under the FCA involving, among other claims, improper payment received from drug manufacturers to favor those manufacturer's products.

100.     Pursuant to Section II.C.2(a) of the CIA, Medco is required to monitor and track all "focus arrangements," which term is defined as all arrangements under which "compensation or remuneration is received by Medco from or on behalf of a pharmaceutical manufacturer, including but not limited to, rebates, regardless of how categorized, market share incentives, commissions, fees under products and services agreements, fees received for sales utilization data and administrative or management fees."

101.     Importantly, the CIA specifically excludes from this definition "purchase discounts based upon invoiced purchase terms."

102.     The term "arrangements" is defined as "every arrangement or transaction that involves, directly or indirectly, the offer, payment, solicitation, or receipt of anything of value: and is between Medco and any actual or potential source of health care business or referrals to

24

Medco or any actual or potential source of health care business or referrals from Medco;" and "health care business or referrals" is to be read to "include referring, recommending, arranging for, ordering, leasing or purchasing of any good, facility, item or service for which payment may be made in whole or in part by a federal health care program."

103.    The CIA imposes penalties for failing to comply with the reporting and other provisions of the agreement and includes a provision providing for the exclusion of Medco from participation in Federal health care programs for a material breach of the CIA.

104.    Under the CIA, the OIG has the right to audit Medco and to interview Medco's employees or contractors for the purposes of verifying and evaluating Medco's compliance with the terms of the CIA, and with the requirements of Medicare, Medicaid, and other Federal health care programs.

## C. Medco's Fraudulent Purchase Discount Scheme

### 1)    The Manipulation of the Corporate Integrity Agreement

105.    In Medco's previous litigation with the U.S. Government, the Government alleged that Medco had not been transparent with respect to its reporting of rebates.  For example, it was not passing through "growth rebates" even though its contract with the Federal employees required 100% of all rebates be passed through.  Relator has personal knowledge from speaking with high ranking officers of Medco, including Medco's head of contracting, Art Nardin, that Medco anticipated that it would be required to be transparent in the future and report and pass through "100% of all rebates" it was receiving from drug manufacturers.

106.    In anticipation of this transparency and reporting requirement, Medco devised a separate and different scheme to retain money it was being paid by drug manufacturers.  Medco knew that it was already receiving "purchase discounts" from drug manufacturers where Medco

either paid in cash or paid within a short period of time, for the purchases it was making.

107.    These prompt payment discounts were generally approximately two percent (2%) of the amount of the purchase.  Medco's head of contracting, Art Nardin devised a plan to divert rebate payments from the rebate category, which would have to be reported to the Government and passed through to all Medco customers, into the existing purchase discount category by simply renaming and converting dollars intended as rebates into off-invoice discounts that were internally referred to as purchase discounts and kept separate from rebates.

108.    Medco, through Nardin, first introduced this innovative new scheme in 2005 during the AZ contract negotiations to renew the contract for Nexium purchases.  Nardin proposed to AZ that instead of paying Medco an additional ten percent (10%) rebate on all Nexium purchases that AZ agree to carve off those rebates and characterize them as purchase discounts in exchange for exclusive formulary placement.

109.    In order to conceal this scheme from Medco's customers, Medco and AZ entered into separate agreements for payment of rebates and purchase discounts.  This allowed Medco to disclose and show only its Nexium rebate agreement with AZ to its commercial and governmental customers and to conceal the fact that it was receiving hundreds of millions of dollars in rebates, which it was re-characterizing as purchase discounts in order to retain that money as a profit margin for Medco and avoid passing it through to its customers.  This novel scheme did not exist prior to 2005 and was concocted by Medco to avoid the fact that its previous schemes to avoid transparency requirements by clients, such as schemes involving "market share" and "growth" rebates, had been discovered by the Government.  Moreover, this scheme involved false claims filed on purchases of Nexium, which was independent of any fraud alleged or committed previously by Medco.

110.    When Medco later settled its FCA suit with the Government, it specifically wrote

into the CIA language to exclude "purchase discounts" from the reporting requirements included

in the CIA.  The Government unknowingly agreed to this exclusion based on the belief that

purchase discounts were in fact the customary purchase discounts of two percent (2%) or less

paid by drug manufacturers to Medco depending on the timing and method of payment.  Medco

did not disclose this to the Government, nor did the Government know that Medco had already

entered into contract agreements which re-characterized substantial percentages of dollars

intended to be rebates into the purchase discount category specifically to avoid revealing them to

Medco customers.  This in itself was a fraud by omission that has never been publicly disclosed

prior to the Relator reporting it to the Government.

111.    Drug manufacturers, and in particular AZ, agreed to engage in this subterfuge

because it provided them with a way to incentivize Medco to place their drugs on Medco's

formularies.  Neither Medco nor AZ disclosed this arrangement to their customers or to the

Government.  In exchange for the hundreds of millions of dollars that AZ was paying to Medco

in the form of purchase discounts, Medco placed Nexium on Medco's formulary in an exclusive

position and encouraged all customers to do the same which, in fact, occurred.  The original AZ

contract signed in 2005 expired in 2007, that contract was renewed in 2007, 2009, 2010, and

again in 2011 and, in substantially the same form, with Express Scripts post-merger.  Each of

those contracts were the basis for hundreds of thousands of false claims which over-reported the

price of Nexium to Government entities.

112.    During all of this time period, AstraZeneca has been paying hundreds of millions

of dollars in rebates to Medco which it re-characterizes as purchase discounts and Medco has

been retaining those purchase discounts and concealing this fact from customers.  Medco has

been doing this despite the fact that in 2005 Medco introduced a transparent model whereby it agreed to pass through to customers, who chose that model, 100% of all manufacturer monies in whatever form received to be provided to the customer.

113.   During this time, various customers audited Medco to determine whether they had received 100% of the manufacturer monies.  During those audits, Medco disclosed only to the auditors the rebate agreements and the payments that are characterized as rebates to Medco. Medco did not disclose the separate secret purchase discount agreement it had with AZ or the hundreds of millions of dollars in payments it had received in the form of off-invoice discounts, despite the fact that both Medco and AZ knew and treated those payments in the same way that they did rebates.  As a result, Medco customers who were seeking reimbursement from the Government were submitting claims to the Government for reimbursement that were tens of millions of dollars higher than they should have been every year from 2005 to the present.

### 2)   The AstraZeneca Agreements

114.   AstraZeneca PLC is a British-Swedish pharmaceutical company headquartered in London, formed by the 1999 merger of Swedish pharmaceutical company Astra AB and the United Kingdom's Zeneca Group PLC.  AstraZeneca's United States subsidiaries include AstraZeneca Pharmaceuticals, L.P., located in Delaware, and AstraZeneca L.P., headquartered in Pennsylvania.

115.   AZ's most successful medication has been Omeprazole, a proton pump inhibitor ("PPI") used in the treatment of ulcers and gastroesophageal reflux disease.  Originally marketed under the brand name Prilosec, the medication was a "blockbuster," achieving annual sales of approximately $6 billion.

116.   However, Prilosec's patent was due to expire in 2002, so AZ sought to maintain

its dominance of the PPI market with the introduction of the chemical compound esomeprazole, which it began marketing under the brand name Nexium.  Nexium was essentially the same medication as Prilosec, but esomeprazole contains one of two mirror-image molecules which combined to form a single molecule in Prilosec, so Nexium was patentable as a separate medication.

117.    Nexium was heavily marketed by AZ as a newer and better version of Prilosec in one of the most expensive marketing campaigns in history.  In 2003, AZ spent $260 million promoting Nexium to American consumers, by far the highest consumer marketing budget for any drug at the time.

118.    This relentless promoting of Nexium skyrocketed United States sales of Nexium to $2.7 billion in 2004.  By 2006, Nexium had more than $5 billion in global sales, and was the second best selling drug in the world, with more than seven million Americans being prescribed the medication.

119.    In August 2003, pharmaceutical giant Merck spun off Medco as a separate corporation.  In its numerous post-Merck public disclosures, Medco senior executives acknowledged that Medco was contractually required to pass on a large percentage (approximately 80% to 90%) of manufacturer rebates to its clients.

120.    During this period, Relator heard one of Medco's senior executives specifically complain that rebates were not generating enough revenue, and stated that his team needed to get creative about earning additional money for Medco.

121.    Beginning in or about 2005, in order to incentivize Medco to push its top drugs Nexium and beta-blocker, Toprol-XL, and to place those drugs on formularies, Medco persuaded AZ to enter into a series of agreements which contained secret kickbacks and were designed to

29

conceal these incentives from Medco clients and the Government.

122.    Just months before signing the AZ Agreements, Medco lost a $100 million plus per year contract with Wyeth (now a part of Pfizer) for its proton pump inhibitor Protonix. Shortly thereafter, Medco contacted AZ seeking to construct a deal for Nexium that would compensate for the huge loss in earnings Medco would experience from the loss of the Wyeth contract.

### 3)    At Medco's Request AstraZeneca Agreed to Conceal Rebates in Secret Agreements

123.    While at Medco, Relator learned that AZ had approached Medco in early 2005, and offered to substantially increase rebates to Medco in order to obtain formulary exclusivity in Medco prescription drug plans.  Medco's response to AZ was to offer not only formulary exclusivity, but the complete lock out of competitor drugs from Medco drug plans, on the condition that AZ re-characterize a portion of the offered rebates as discounts, which would be treated as purchase discounts, appearing only on the invoice, and reducing the price to Medco, but not to the client.  The AZ Agreements contained such "lock-out provisions."  These agreements were designed to create additional profit for Medco that would be concealed from its customers.

124.    The discount contracts and the rebate contracts were negotiated at the same time and as part of the same agreements.  Relator knows of no legitimate business purpose for creating separate agreements for the discount provisions and unless you are an insider you would not immediately understand the scheme from the face of the agreements.  Relator is aware, however, that Medco had a practice of creating separate agreements for the purpose of removing those agreements and the flow of money under those agreements from the audit stream and concealing those agreements from clients, including the Government.

30

125.     Medco had not previously entered into separate or side agreements with branded pharmaceutical manufacturers regarding discounts like this, and in any event such agreements had not previously been commonly part of Medco's major branded drug acquisition contractual arrangements.

126.     The AZ Nexium Agreements were executed in or about November of 2005.  The Contract Distribution cover page identified Relator as the third person on the distribution list for Medco, right after Art Nardin and John Henderson.  The secret discount agreement for Nexium (the "Nexium Discount Agreement") provided Medco with a "NEXIUM DISCOUNT" of the Wholesale Acquisition Cost ("WAC") of the drug minus ten percent (10%).  This discount was originally part of the rebate for Nexium, but, at Medco's insistence, AZ agreed to carve off ten percent (10%) in exchange for exclusive formulary status.

127.     The AZ Toprol-XL Agreements were executed in or about January of 2007.  The discount agreement for Toprol-XL (the "Toprol-XL Discount Agreement") provided Medco with a "TOPROL-XL DISCOUNT" of WAC minus thirty percent (30%).

128.     Concurrently with the AZ Agreements, as a quid pro quo, Medco made Nexium its exclusive branded proton pump inhibitor in its national formulary, Preferred Prescriptions. Medco granted similar formulary exclusivity to Toprol-XL.

129.     Significantly, in exchange for the increased rebates it obtained pursuant to the AZ Discount Agreements, Medco also agreed to the complete lock-out from its drug plans of drugs which compete with Nexium and Toprol-XL.

130.     Relator has personal knowledge that, following the signing of the AZ Agreements, Medco aggressively pushed its relationship with AZ and moved Nexium to the top of its formularies.  Nexium became the number one purchased drug in Medco's business.

31

131.    The Relator has personal knowledge that the AZ Discount Agreements generated an unusual degree of excitement and self-congratulations on the part of the Medco Pharmaceutical Contracting Group and others, and yet, oddly, was not widely discussed even within the group that handled such contracts, but rather was kept largely under wraps.

132.    Since new, retained purchase discounts would significantly and materially enhance Medco's gross profits and his personal recognition, Nardin informed Medco's CEO and CFO of this scheme's financial benefits (Nardin reported directly to the CEO).  In addition, Medco's Employer Customer Group's president Bryan Birch informed Relator that Nardin, through Medco's Executive Committee, had a significant portion of the year-end 2006 and 2007 executive bonuses in Medco's customer groups tied to the success of Formulary Coverage Review ("FCR"), a program Mr. Nardin managed and a critical element of Nexium's post-Nexium Discount Agreement promotion.  Also in late 2007, Relator and Bryan Birch had face-to-face meeting with John Henderson and Tom Moriarty (other executives in charge of Medco's pharmaceutical contracting) regarding the recent renewal of the Nexium Discount Agreement. As a result of that meeting, Henderson and Moriarty were aware of the financial benefits of the Nexium Discount Agreement scheme.

133.    In or about January 2007, Medco and AZ renewed the AZ Nexium Agreements and executed the AZ Toprol-XL Agreements.  The Nexium Agreement was effective "through to the end of the year 2009."

134.    The 2007 discount agreement for Nexium reduced the "NEXIUM DISCOUNT" to WAC minus five percent (5%).

135.    The substance of the 2007 agreements, and the unusual bifurcated structure, remained intact, despite Medco's having entered into the CIA just 3 months earlier, which was

aimed directly at transparency of all rebates and preventing future violations of federal law and of regulations relating to federal health care programs such as Medicare.

136.    Customary pharmaceutical manufacturer purchase discount incentives generally provide for two percent (2%) discounts off the Wholesale Acquisition Cost ("WAC") of all of a manufacturer's drugs sold pursuant to a given invoice if that invoice is paid promptly, including those purchased directly by a PBM for its own mail-order pharmacy's use.  For example, a typical purchase discount agreement follows a "2/10 net 30" formula, under which the purchaser receives a two percent (2%) discount for paying an invoice within 10 days of the invoice date.

137.    Contrary to this customary industry practice, the AZ Discount Agreements provided incentives far greater than a two percent (2%) discount, and these incentives were not tied to prompt payment, but instead were tied to volume, just as formulary rebates are.

138.    The AZ Agreements contained separate provisions which paid Medco two percent (2%) for the prompt payment of invoices.  By contrast, the "NEXIUM DISCOUNT" and "TOPROL-XL DISCOUNT" language in the agreements did not require any specific time of payment and did not require prompt payment or any specific manner of payment; merely by paying for Nexium and Toprol-XL, Medco received the discounts.

139.    Although they attempted to maintain the fiction that the discounts Medco was receiving were different than the rebates, Medco and AZ treated these discounts and rebates as interchangeable.  The fact that Medco and AZ viewed these purchase discounts and rebates as interchangeable was confirmed when, in 2007, Medco renewed its Nexium contract with AZ, and AZ requested that Medco "move" some of the rebates it was receiving in the form of the NEXIUM DISCOUNT over to the client rebate category in order to better incentivize Medco clients to make Nexium exclusive on their formularies, and/or to lock out other competitors, and

33

Medco agreed.

140.    Relator met with Mr. Jeff May, a senior executive at Medco, around this time, and reviewed the renewal agreements and discussed them.  During this time, Relator was told that AZ had complained to Medco that the rebates being passed through to the client were not large enough to incentivize the client to make Nexium exclusive on its formulary, and/or to lock out other competitors.  AZ requested that Medco "move" some of the rebates it was receiving in the form of purchase discounts over to the client rebate category and Medco agreed.  Thus, there was a direct, inverse relationship between purchase discounts and rebates.  Both AZ and Medco agreed that the purchase discounts and rebates were two sides of the same coin, and treated them as such.

141.    Relator also reviewed the AZ Agreements shortly after they were executed and understood that, as an additional incentive to obtain the discounts, Medco took the highly unusual step of agreeing to forfeit potential audit rights with respect to past rebate agreements with AZ.

142.    Medco's plainly artificial and intentional segregation of the AZ rebates into separate "rebate" and "discount" agreements was a sham to disguise and conceal a portion of Medco's financial incentives and thus avoid having to disclose (and share) these rebates with its clients.  Treating what in substance was a rebate as a purchase discount, likewise served to circumvent the CIA's reporting requirements while appearing fully transparent and in compliance with the CIA.

143.    For example, when clients requested information about the net cost of their drugs after rebates to confirm that they were getting rebate pass-throughs, the reports they were given did not reveal the existence of the NEXIUM and TOPROL-XL DISCOUNTS, and the discount

figures were not included in the net cost analysis prepared for them.  Therefore, when a client was making a decision whether or not to prefer Nexium and/or lock-out Nexium's competitors in its formulary,  it could and did not know that Medco was receiving secret kickbacks in the form of purchase discounts if they did so.

144.    Medco employees, including Relator, who provided  back-up documentation to auditors, including auditors working for clients with manufacturer discount-sharing agreements, were instructed to only include contracts containing provisions for rebates that were passed through to the clients, and not to provide other contracts that related to monies Medco retained.

145.    In or about 2006, Relator spoke with Ms. Regina Dennis, a Vice President at Medco who reported directly to Relator and who took over Relator's responsibilities when he changed job roles from administering all pharmaceutical contracts and audits in 2005 to an exclusive focus on manufacturer agreements and Medicare.  Ms. Dennis confirmed that she followed the same procedure as Relator had been instructed to follow, which was to only provide auditors with contracts containing provisions for rebates that were passed through to the clients, and not to provide other contracts that related to monies Medco retained.

146.    Medco's Pharmaceutical Contracting executives also sought to convert rebates into discounts to create private kickback streams as part of negotiations with pharmaceutical manufacturers other than AZ.  Manufacturers who would not agree to these secret discounts were not put on formularies in exclusive positions.

147.    Shortly after the initial execution of AZ's Nexium Discount Agreement, Relator and Nardin were co-managing the renegotiation of Merck's rebate deal with Medco.  At the time, the Merck deal was Medco's most important rebate negotiation and included frequent briefings to Medco's CEO and its Executive Committee.

148.    Shortly after the 2005 Agreement was executed with AZ, Medco and Art Nardin attempted to introduce this scheme into other drug manufacturer contracts.  In particular, in late 2005, Nardin met with Relator who was part of the Medco contracting senior team and told him that he wanted to propose the same rebate/purchase scheme in the upcoming contract discussions with Merck.

149.    In a face-to-face meeting in late 2005, Nardin told Relator that he wanted to try a new idea and apply the tactics in Medco's recently signed Nexium deal to Merck – specifically to reduce mail rebates for a commensurate large mail purchase discount.  Nardin requested that a short presentation be prepared with his new proposal for Medco's upcoming meeting with Merck.  At Nardin's instruction, Relator put together a PowerPoint presentation which described for Merck how the purchase discount scheme would operate and explained that a portion of mail rebates that manufacturers were offering Medco would be transformed into purchase discounts and treated separately in separate agreements.

150.    In or about November of 2005, Nardin and Relator met with representatives of Merck where Nardin presented the PowerPoint explaining in great detail how the rebates offered by Merck could be transformed into purchase discounts.  Nardin also explained to Merck that agreeing to this arrangement would provide great flexibility in placing key Merck drugs on Medco's formularies and its customer's formularies in exclusive positions.  Nardin also told Merck that it had entered into a similar arrangement with AZ.

151.    Also attending the Merck meeting with Relator and Nardin was Joanne Taylor, a Director in Medco's Pharmaceutical Contracting group.  The arrangement was proposed to four Merck representatives, including Mr. Andrew Tedeschi, Mr. John Harrington, Mr. Richard Patrylak and Ms. Deborah Gan, by the head of Medco's Pharmaceutical Contracting, Art Nardin.

36

Several days later, Merck responded that it was uncomfortable with this proposal and refused to participate.

152.    As Relator recalls, the meeting and the negotiations related to the new purchase discount proposal.  Relator also recalls that Merck was confused by Medco's new purchase discount proposal which required them to divide payments into rebates and purchase discounts, and asked Nardin why they should prefer it to the rebates-only structure they had in their existing Medco agreement.  In his reply, Nardin asked if Merck was aware of Medco's new efforts to promote Nexium exclusively in formularies and to reduce utilization of Nexium's competitors via Medco's FCR program.  Merck confirmed they had heard rumors of Medco's new promotional efforts.  Nardin indicated that Nexium's new promotion results within Medco were spectacular and that AZ's new deal structure permitted him the "flexibility" to promote Nexium. Nardin said that if he had a similar purchase discount-type deal with Merck, Medco would have the flexibility to undertake the same kinds of promotions for Merck's leading products.  From these discussions, Relator gained personal knowledge that Medco likely intended to retain most of the side deal "purchase discounts" as profit for Medco.

153.    After a number of additional discussions, Merck rejected Nardin and Medco's proposal in a meeting that Relator attended indicating that it was concerned about the "optics" of re-characterizing rebates as purchase discounts and preferred to pay all of the money in rebates that would be passed through to the customer.  Merck declined to pursue the proposed bifurcation because they said they preferred the simplicity of the "rebates-only" deal structure both parties already had in-place and which was ultimately reused in the new Merck-Medco deal concluded in February 2006.

154.    Sometime later in late 2005 or early 2006 , Relator was present in a conversation

37

between Merck and Nardin in which Merck's representatives were complaining that Medco was not allowing Merck to participate in Medco's FCR program which encouraged the use of drugs on Medco's formulary. In that conversation, Nardin reminded Merck that placement in the FCR program was a quid pro quo that had been offered for re-characterizing and counting rebates to purchase discounts in which Merck had refused to participate. The clear indication to Relator from this conversation was that Medco was requiring drug companies to pay kickbacks in the form of purchase discounts in order push their drugs on its formularies and customers who refused to do so would not receive this benefit.

155.    Between 2005 and 2008 (when Relator left Medco), Relator became aware that Medco had successfully negotiated additional purchase discount programs with various drug companies. Relator also had a number of discussions with Nardin, Henderson and Moriarty in which they told him that the purchase discount program was very profitable for Medco.

156.    Relator has personal knowledge that not only were Mr. Nardin and other senior executives who worked with him aware of the discounts scheme, but those who succeeded Mr. Nardin, including General Counsel and head of Pharmaceutical Contracting, Thomas Moriarty, were also aware of it. Specifically, Relator presented an analysis he had performed to Mr. Moriarty, in which Relator had determined that it was potentially in the best interests of General Electric to exclude Nexium on its formulary. Relator explained to Mr. Moriarty that it was also in Medco's interest to make this change because of the large subsidies Medco was providing to General Electric on the costs of Nexium. During this conversation, Relator specifically recalls making Mr. Moriarty aware that the Relator had, in his analysis, taken into account the value to Medco of Nexium's secret purchase discounts. Mr. Moriarity and Medco ultimately decided to continue to recommend Nexium to GE as the exclusive covered medication in its relevant

formulary therapeutic category.

157.     Characterizing an additional rebate on selected AZ products as a discount made it possible for Medco to significantly increase its profits and retain potential drug savings from clients which had bargained to receive a share of any financial inducements obtained on their branded pharmaceutical dispensing.  Although some, though not all, of the AZ Agreements contain language to suggest that the discounts will not be provided on Government related programs, Relator has personal knowledge that neither the computerized accounting systems within Medco, nor the mail-order systems by which Medco dispenses drugs, were set up to segregate, or to make distinctions between, drugs being utilized for Government and for commercial plans, and that Medco did not, in fact, make such distinctions.

158.     Based on Relator's knowledge of Medco's computer accounting system and of the people who handled accounting processes both during and after his tenure at Medco, there was, thus, no way for Medco to account for, or to report, these discounts for the purposes of RDS or Part D reporting, either on those reports provided by Medco to participants or on those reports provided directly to the Government by Medco on behalf of participants.

159.     Accordingly, such self-serving and illusory provisions were impractical, not enforceable, and designed merely to shield the parties from accusations of wrong-doing in the event the discount arrangements were to come to light. In fact, later contracts between the parties even contained acknowledgments that Medco could not, in fact, make such distinctions.

160.     In or about April 2009, Medco and AZ again renewed the AZ Nexium Agreement, this time titling it "Purchase Discount Agreement," which was effective through the end of 2012.

161.     In or about March 2010, Medco and AZ again renewed the AZ Nexium

Agreement, titled "Purchase Discount Agreement," which was effective through at least the end of 2014.

162.    Whether labeled a "purchase discount," a "Nexium discount," a "Nexium discounted price," or a "Nexium purchase discount," the discounts all functioned the same utilizing the loophole in the CIA.  The preamble to each agreement specified that it set out the "terms and conditions relating to the direct sale by AstraZeneca to Medco of NEXIUM . . . for dispensing to [customers] . . . by Medco's affiliated mail service pharmacies . . . ."

163.    In negotiating rebates, as shown in this excerpt from an internal Medco document below, Medco and AZ recognized that the value of the Purchase Discount was factored into the value of the Total Mail rebate that was paid on Nexium.

| Medco Nexium Term Sheet for 2009 Rebates | | | | |
|---|---|---|---|---|
| | | | | |
| Effective date: 1/1/2009 through 12/31/2012 | | | | |
| | | | | |
| Formulary Access Rebates | | | | |
| | Mail | Purchase Discount | Total Mail | Retail |
| 1/1/2009 through 3/31/2009 | | | | |
| Nexium on formulary | 46% | 5% | 51% | 46% |
| Nexium PDST and FEP | 55% | 5% | 60% | 60% |
| | | | | |
| 4/1/2009 through 12/31/2009 | | | | |
| Nexium on formulary | 46% | 9% | 55% | 46% |
| Nexium PDST and FEP | 57% | 9% | 66% | 66% |
| | | | | |
| 1/1/2010 through 12/31/2012 | | | | |
| Nexium on formulary | 46% | 10% | 56% | 46% |
| Nexium PDST and FEP | 60% | 10% | 70% | 70% |
| * Current carve out contracts for Premera Blue Cross, State of NY and 1199SEIU shall remain | | | | |

The Medco Nexium Term Sheet summarized the Nexium rebates and specifically acknowledged that the Mail Rebate plus the Purchase Discount equaled the Total Mail Rebate when calculating the amount of rebates that Medco was receiving from AZ through 2012.

40

164.    This scheme to retain the Nexium purchase discount not only affected governmental programs, but it also affected private organization such as HealthNow who believed it was receiving all of the Nexium rebates.  In an internal email, dated June 11, 2009, Medco executives discussed providing HealthNow with the "incremental Nexium rebates" in addition to the regular rebate, while Medco would "retain[] the incremental purchase discount."

165.    Guardian Life also partnered with Medco for prescription drugs and, in another internal Medco email, dated April 2, 2009, Medco executives were worried about losing Guardian's business.  Despite their concern, they discussed that in addition to the rebates listed in a spreadsheet, "there is also an additional purchase discount which will be to Medco margin and will eventually be captured by Jeff May, once the deal is signed."

166.    Medco's scheme continued until it merged with ESI and was then recast as an "Indirect Purchase Agreement."  In an internal June 25, 2013 letter discussing the transition, AZ and ESI expressly acknowledged that:

> Medco and AstraZeneca are parties to several purchase discount Agreements, specifically the Crestor® (rosuvastatin calcium) Purchase Agreement, effective January 1, 2007, the Nexium® (esomprazole magnesium)/ Nexium® (esomprazole magnesium) For Delayed Release Oral Suspension (collectively "Nexium") Purchase Agreement, effective April 1, 2009, the Toprol XL® (metoprolol succinate) Purchase Agreement, effective March 15, 2007, the Vimovo Purchase Agreement, effective September 1, 2010, and the Purchase Discount Agreement for multiple products with the Agreement # PS-237301, effective March 1, 2010, under which discounts are made available to Medco for the direct sale of product by AstraZeneca to Medco (collectively, "Direct Medco Purchase Agreements").

167.    After Relator left Medco in 2008, Relator monitored periodically public announcements made by Medco and later Express Scripts.  The existence of the purchase discount scheme was never publicly disclosed by Medco until Relator revealed the scheme to federal prosecutors, in or about 2009, as part of his disclosure statement pursuant to the requirements of the False Claims Act.  To Relator's knowledge, all of the purchase discount arrangements that were in place when he left Medco have been renewed and are currently in

41

place in one form or another including the arrangement with AstraZeneca.

168.     Both private, government and state customers of Medco, including Part D and RDS Programs, continue to be defrauded of tens of millions of dollars per year as a result of Medco's fraudulent purchase discount scheme.  This scheme began in 2005, continued in 2007 when the agreements were renewed through 2009, and was still continuing with Express Scripts until at least 2013.  Despite the filing of this lawsuit, Medco has made no attempts, to Relators knowledge, to modify or stop its fraud.

### 4)     Medco's Actions Constitute Violations of the Anti-Kickback Statute and the False Claims Act

169.     As detailed above, AZ clandestinely paid rebates as kickbacks to Medco, which were disguised as purchase discounts to avoid detection.  Medco sought these kickbacks, and AZ paid them, in exchange for Medco favoring certain AZ drugs on its formularies.  The characterization of these discounts as off-invoice discounts was an intentional ploy to circumvent the CIA's reporting requirements while appearing fully transparent.  This ploy also facilitated Medco's scheme to retain these rebates and avoid having to report these rebates to its clients.  As a result, these rebates were not passed on to Medco's clients or the U.S. Government.

170.     The AZ Discount Agreements on NEXIUM and TOPROL-XL unquestionably violated the intent of the CIA, in that they are nothing more than a form of rebate that should be passed on to Medco's clients, including the U.S. Government, the states (including their employee retirement systems), and private clients applying for drug reimbursements and subsidies under Medicare Part D, including RDS.

171.     In addition, putting aside whether its clients were entitled to the rebates (which most of them were), Medco did not disclose to its clients it was receiving these rebates and continues to conceal these rebates.  Indeed, Medco's typical agreements with its clients led

clients to believe that Medco was only withholding minor off-invoice discounts based on payment terms and not formulary placement rebates.

172.    In fact, Medco specifically solicited these clandestine AZ rebates in exchange for the placement of Nexium and Toprol-XL on client formularies, with the intent of tainting the decision making process with respect to formulary placement, lock-out of competitor drugs  and, ultimately, the purchase of drugs for which reimbursement and subsidy payments would be made by the Government, in violation of the Anti-Kickback Statute.

173.    The AZ Discount Agreements also represent clandestine profit sources, or kickbacks, to incentivize Medco to promote the drugs through formulary copay incentives, various patient/prescriber communications, and coverage limitation efforts designed to coerce physicians into prescribing Nexium and Toprol-XL for client patients, including those whose drugs are subsidized or reimbursed by the Government, in violation of the Anti-Kickback Statute and thereby violating the False Claims Act.

174.    Further, Medco knowingly submitted and/or caused to be submitted, false certifications (both express and implied) to the Government, every year since 2005, concerning compliance with the Anti-Kickback Statute, actual compliance with which is a condition of payment by the Government, in violation of the False Claims Act.

175.    These kickbacks were material to Government's payment decision because the Government has a stated policy that it will not pay for services or goods tainted by kickbacks.

### 5)    Medco's Actions Submitted in connection with Part D Violated the FCA

176.    When in 2006 Part D and RDS became effective, Medco's fraud extended beyond state and federal entities who were purchasing from Medco and defrauded these new programs that were subject to new and different regulations and could not have been previously defrauded.

43

177.    Medco's violation of the Anti-Kickback Statute was not only a substantial factor, it was the factor in bringing about the filing of factually false claims and false certifications to the Government on the part of, or on behalf of, plan sponsors.

178.    In addition, as set forth in greater detail above, under Part D, Plan Sponsors are required to report all "direct or indirect remuneration" from pharmaceutical manufacturers even if it is retained by the PBM.  Medco knowingly submitted false records or statements to clients and to the Government, on behalf of clients who hired Medco to report accurate discounts and rebates under Part D and RDS, about the cost of drugs, which did not reflect the true cost of those drugs,  causing, and continuing to cause, RDS and Part D Plan Sponsors and/or their agents, to submit false reimbursement claims to the Government, every year since 2005, in violation of the False Claims Act.

### 6)    Medco's Actions In Connection With the RDS Program Violated the FCA

179.    Medco's failure to report and to pass on its hidden rebates to its RDS Sponsor clients, which it was required to do in the majority of cases, caused these clients, and continue to cause these clients, to submit reimbursement claims to the Government that contained material omissions and did not reflect the total sum of the rebates which were rightfully to have been applied to the drugs they purchased, causing the Government to overpay on RDS reimbursements for those drugs.

180.    Medco was not only extremely familiar with the RDS program, but held itself out as an expert on the program, and knew well that its actions would result in substantial overpayments by the Government.

181.    Irrespective of whether RDS Sponsors are required to report reimbursements that are not passed through to them, Medco's mischaracterization of the rebates as discounts caused

44

false claims to be submitted by, or on behalf of, Medco's RDS Sponsor clients, every year since 2005. These statements were material to the false claims because if the Government had known that it was over reimbursing RDS Sponsors as a result of Medco's fraud it would not have done so.

### 7) Medco's Actions Constitute Violations of the State False Claims Acts

182.    State run healthcare plans, employee retirement systems, and unions, in California, Florida, and New Jersey, contract with and utilize the pharmacy benefits provided by Medco and Express Scripts. They all contract for full disclosure and transparency in pharmacy pricing and require that one hundred percent (100%) of manufacturer rebates be passed through to the state clients.

183.    As detailed herein, Medco sought and obtained secret kickbacks from AZ, which were disguised as purchase discounts to avoid detection and avoid the requirement of passing through rebates, in exchange for Medco favoring certain AZ drugs on its formularies. The characterization of these discounts as off-invoice discounts, as opposed to the rebates that they were, was an intentional ploy to appear fully transparent while retaining these rebates and avoiding having to report these rebates to its clients. As a result, these rebates were not passed on to Medco's state clients.

184.    The AZ Discount Agreements on NEXIUM and TOPROL-XL unquestionably violated, and no doubt continue to violate, the express terms of these contracts. These purchase discounts are nothing more than a form of rebate that should be passed on to Medco's clients.

185.    In addition, aside from the fact that its state clients were contractually entitled to the rebates, Medco did not disclose to them that it was receiving these rebates. Indeed, Medco's typical agreements with its clients led clients to believe that Medco was only withholding minor

off-invoice discounts based on payment terms and not formulary placement rebates.  In fact, formulary rebates are rebates that are expected to be passed through to these clients.

186.    In fact, Medco specifically solicited these clandestine AZ rebates in exchange for the placement of Nexium and Toprol-XL on client formularies, with the intent of tainting the decision making process with respect to formulary placement, the lock-out of competitor drugs and, ultimately, the purchase of drugs for which state clients would ultimately be forced to pay a higher price.

187.    The AZ Discount Agreements also represent clandestine profit sources, or kickbacks, to incentivize Defendants to promote the drugs through formulary copay incentives, various patient/prescriber communications, and coverage limitation efforts designed to coerce physicians into prescribing Nexium and Toprol-XL for client patients, including those whose drugs are subsidized or reimbursed by the state clients, thereby violating the False Claims Acts.

188.    Further, Medco knowingly submitted and/or caused to be submitted, false certifications (both express and implied), every year since 2005, to the state clients concerning compliance with state laws, actual compliance with which is a condition of payment, in violation of the state False Claims Acts.

189.    These kickbacks were material to the payment decisions by the state clients because they all have stated policies that they will not pay for services or goods tainted by kickbacks.

190.    In sum, the AZ Discount Agreements constitute violations of the CIA and the federal and state False Claims Acts.

**D.  Relator Paul Denis is an Original Source of Defendants' Purchase Discount Scheme**

191.    Relator is a prototypical insider who worked for the contracting department at Medco that carried out the purchase discount scheme.  Between 1992 and 2005, Relator was responsible for tracking rebates on customer contracts and was intimately familiar with the accounting systems and mail order dispensing systems that were used to service those contracts. In 2005, Relator changed roles in the senior contracting team and was one of only three people at Medco who was fully familiar with the drug contracting strategies that Medco was using and with the ongoing negotiations that Medco was engaged in (the other two Medco Senior officers, Art Nardin and John Henderson, were the architects of the scheme).

192.    Shortly after they were negotiated in 2005 with AZ, Relator gained personal knowledge of the scheme when copies of the purchase discount agreements and rebate agreements were formally distributed to him as part of a distribution list.  As part of his job as a senior member of this Medco contracting department, Relator was obligated to review and be familiar with such agreements.  Accordingly he reviewed the agreements in detail and saw first hand that Medco was transforming what were in fact rebates into purchase discounts.

193.    This fact was confirmed shortly thereafter when Relator met with Art Nardin, who was the architect of the AZ purchase discount scheme.  Nardin explained the scheme in detail to Relator in order that Relator could prepare a PowerPoint to be used in the upcoming Merck negotiations to try to persuade Merck to participate in the purchase discount agreement. During the meetings with Nardin, Relator discussed at length the details of the scheme and prepared a PowerPoint to be showed at the meeting with Merck.  Accordingly, Relator had personal knowledge of Medco's motivations and intention in negotiating the purchase discount scheme with AZ and the precise details of that scheme.

194.    Relator also reviewed and was familiar with the smoking gun documents which

47

included the AZ rebate agreements and secret purchase discount agreements which detailed how the scheme was to be implemented.  Relator was present when Nardin presented the scheme to Merck and told Merck that AZ had agreed to a similar arrangement.

195.    Following these meetings, Relator conferred with Regina Dennis in 2006. Ms. Dennis had taken over Relator's responsibilities for implementing the drug manufacturer contracts and tracking rebates.  Ms. Dennis informed Relator that she was not disclosing the purchase discounts to commercial or governmental customers or agencies and was continuing to operate in the same manner that Relator had, which was to provide only rebate contract and rebate information to customers or agencies who are auditing the contracts.

196.    Relator also had personal knowledge that the accounting systems at Medco were not set up to segregate or make distinctions between drugs purchased for or provided to government programs or plans and private commercial plans nor did such systems, therefore provide the ability to account for or report purchase discounts to Part D or RDS Programs. Based on this fact Relator has personal knowledge that Medco was not reporting purchase discount payments it was receiving from AZ and other drug manufacturers to Part D despite the fact that Part D regulations clearly require such payments to be reported whether or not they are passed through to the customer.

197.    Relator also has personal knowledge that the head of contracting, Tom Moriarty, who was also the General Counsel of Medco at the time, had detailed knowledge of the purchase discount fraud scheme being carried out by Medco as early as 2007.  This was evident to Relator when in or about 2007, while working alongside the people responsible for negotiating the renewed agreement with AZ, Relator assembled a presentation attempting to persuade Moriarty and Henderson to move away from the purchase discount agreement and to respond to customer

requests to use available generic substitutes (*e.g.*, Omeprazole), which were far less expensive and had the same efficacy.

198.    During that presentation to Moriarty and Henderson that ensued, Relator presented spreadsheets that showed the purchase discounts that Medco was retaining and the rebates that Medco was passing through on Nexium.  During his discussion with Moriarty and Henderson, Moriarty and Henderson made statements that made it clear to Relator that they understood that the purchase discounts were essentially rebates but had been re-characterized as purchase discounts so that Medco could retain them.  Moriarty and Henderson told Relator that they were unwilling to give up the revenue Medco was deriving from these purchase discounts that they were receiving on Nexium and accordingly refused to adopt a new program that permitted the use of far less expensive generic versions exclusively.  Before this presentation, Relator had personal knowledge that when a new AZ agreement was negotiated in 2007, purchase discounts were retained by Medco as part of the agreement.

199.    Relator was also told, as one of the individuals involved in contract negotiations, that AZ was concerned that Medco was not passing through enough of its rebates and wanted to transfer some of these rebates, which had been characterized as purchase discounts, and move them back to rebates.  After much discussion, Medco agreed to do this and Relator reviewed the final executed contract confirming that the scheme would continue in this modified form.

200.    Relator possesses this unique understanding of Medco's fraud and the relationship of the agreements with AZ – something that cannot be gleaned from the face of the agreements or any prior fraudulent schemes committed by Medco or AZ.  Indeed, this is a distinctive scheme that was formulated to conceal new rebates carved out starting with the 2005 Nexium discount agreement and intended to avoid the CIA's transparency requirements.

201.    Since filing this action, Relator has reviewed the complaints filed by Karl S.
Schumann and Paul DiMattia and F. Folger Tuggle.  Those complaints do not disclose the
scheme which Relator here has detailed in this complaint and neither alleged fraud on Medicare
Part D or Medicare's Retirement Drug Subsidy program ("RDS").

202.    Mr. Schumann was only employed by Medco from December, 1999 to January,
2003 (*Schumann* Fourth AC, Civ. Action No. 03-5423, ¶ 10), and was not involved in the
negotiations with AZ in 2005 and could not have information concerning the purchase discount
scheme that is described herein.  In addition, the Covered Conduct that was the subject of the
Government settlement in *Schumann* ranged from 1999 through October 1, 2005[2] and the
conduct alleged by Relator occurred during later periods and seeks separate and independent
damages.  Medco also previously settled claims in *Schumann* involving the concealment of
discounts that were laundered through payments for "rebates, disease-management fees, sham
service fees, and unrestricted educational grants," (*Schumann* Fourth AC ¶¶117, 119), which are
different from what is alleged herein.

203.    Messrs. DiMattia and Tuggle had worked for AZ until 2009 and, while they may
have had knowledge concerning AZ's participation in certain contracts with Medco, they did not
have the background nor the knowledge concerning Medco's purchase discount scheme alleged
and documented in this action, which is why it was not alleged in their complaint.

204.    In particular, the allegations in the *DiMattia* complaint and those allegations
related to a separate scheme apparently introduced by AZ  in 2004 to pay actual rebates on drugs
other than Nexium in an effort to "circumvent[] its best price obligations" for Nexium.
(*DiMattia* Compl., Civ. Action No. 10-910, ¶ 2).  In fact, "AZ fraudulently disguised said $100

---

[2] *See* Schumann Settlement Agreement at 4 (available at
https://www.sec.gov/Archives/edgar/data/1170650/000119312506217137/dex102.htm).

Million in Nexium quid pro quo discounts, in the form of deep discounts to Medco for AZ's drug Prilosec, having a value to Medco of approximately $100 Million." (*Id.* at ¶ 67). Again, starting in 2007, AZ began providing Medco with additional kickbacks of $40 Million annually on Toprol XL, Prilosec, and Plendil, so as to avoid discounting Nexium and impacting best price. (*Id.* at ¶ 73). Importantly, knowing the gravity of its subterfuge, AZ held these meetings in secret and the "agreements were not reduced to writing." (*Id.* at ¶ 76). It further alleged that AZ's conduct violated AZ's Corporate Integrity Agreement effective in June 2003 and paralleled its prior illegal conduct that resulted in two previous CIAs related "to its illegal sale and marketing of the drugs, Zoladex and Seroquel." (*Id.* at ¶¶ 2, 51-55).

205.    The scheme alleged in *DiMattia* was separate and independent of the scheme Relator details in this complaint, which alleges significant hidden discounts directly on Nexium and does not involve kickbacks on Nexium or best price. Meanwhile *DiMattia* did not involve off-invoice or "purchase discounts" on Nexium or even any payments on Nexium.

206.    Further, the Government, the *DiMattia* relators, and significantly Medco have all acknowledged that the fraud alleged in this action is a materially different scheme with different damages because they carved this action out of their settlement and the covered conduct in *United States ex rel. DiMattia et al. v. Medco Health Solutions Inc.*, No. 13-1285 (D. Del.), (Settlement Agreement executed on or about May 7, 2015, Ex. A at 5):

6.    Notwithstanding the releases given in paragraph 2 of this Agreement, or any other term of this Agreement, the following claims of the United States are specifically reserved and are not released:

* * *

      i.   The allegations asserted in the pending *qui tam United States ex rel.*

      *Doe v. Medco Health Solutions*, Case No.  11-684 (D.Del.).

Indeed, Medco has never argued that the allegations in this action were settled or barred by res

judicata, and counsel for the *DiMattia* relators has agreed that they had no information or

knowledge concerning this fraud.  This conclusively establishes that *DiMattia* did not put the

Government on the trail of this fraud.

      207.   To Relator's knowledge, none of the relators who had previously filed complaints

against Medco had personal knowledge regarding the details set forth in this complaint and none

of them would have been in a position to reveal to the Government the scheme that underlies

what on its face appeared to be relatively benign contracts.  Indeed, only two other people at

Medco had the detailed knowledge pertaining to this scheme and those two people were the

architects of this scheme Art Nardin and John Henderson.

**E.  Damages Caused by Medco's Unlawful Scheme**

      208.   As described herein, Medco violated the federal and state False Claims Acts by

engaging in fraudulent business practices which resulted in the federal and state governments

overpaying for drugs or over-reimbursing prescription subsidies, and paying for drugs which

might not have been prescribed but for the payment of kickbacks by their manufacturer.

      209.   In mischaracterizing rebates as discounts, and treating them as purchase discounts

based on invoiced purchase terms, and thus failing to pass on those "discounts" to its clients

eligible for manufacturer rebate-sharing, including RDS Plan Sponsors, Part D beneficiaries

enrolled directly in Medco PDPs, employers who obtain their EGWP's from Medco, state run

healthcare plans and unions, and other Part D Plan Sponsors whose plans are administered by

Medco and, subsequently, Express Scripts, Defendants violated applicable statutes and

regulations, including, but not limited to, the Anti-Kickback Statute and the state and federal False Claims Acts.

210.    More specifically, because the RDS Program has provided enrolled employers and unions with subsidies for their Part D eligible retirees' prescription drug costs, and has excluded the subsidies received from taxable income, the Federal Government has made substantially higher payments to RDS Plan Sponsors because of Medco's concealment and failure to pass on the rebates it is receiving on covered drugs from AZ.

211.    In addition, through direct contracts with state run healthcare plans and unions, and state and privately funded health plans receiving Government subsidies, Medco has received millions of dollars in increased profits from the AZ Discount Agreements, which should have otherwise been transparent and made available via rebate sharing arrangements to these clients.

212.    Further, because CMS makes payments to Medco, and to Part D Plans managed by Medco, on behalf of Medicare Part D beneficiaries, Medco's concealment of these rebates is increasing Government payments under the Part D program.

213.    Because of Medco's fraudulent practices, state run healthcare plan and union, Part D Plan and RDS plan participants more frequently purchased, and paid more for, Nexium and Toprol-XL than they would have otherwise, in violation of state and federal law.

214.     Medco's illegal actions also caused Medco PDP participants, on behalf of whom CMS makes payments directly to Medco, to overpay for prescription drugs.

215.    Medco's illegal actions resulted in a direct annual loss of tens of millions of dollars, and at least $50 million during the relevant period that continued to grow as this scheme continued with Express Scripts, to the federal and state governments under the False Claims Acts.

## VII.   CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

(Violations of Anti-Kickback Statute and False Claims Act)
(42 U.S.C. § 1320a-7a)

216.     Relator repeats and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

217.     By engaging in the conduct described in the foregoing Paragraphs, the Defendants have violated 42 U.S.C. § 1320a-7a and 42 C.F.R. § 1001.952(f).

218.     In particular, the Defendants have knowingly caused to be submitted claims to the United States Government as a result of the solicitation and receipt of the above-described kickbacks.  The payment or receipt of kickbacks to induce purchases constitutes remuneration to increase the level of business in violation of the anti-kickback statute.

219.     As a result of the conduct set forth in this cause of action, the Government suffered harm as a result of paying or reimbursing for drugs which, had the Government known were utilized as a result of kickbacks, the Government would not otherwise have paid for and/or reimbursed.

## SECOND CAUSE OF ACTION

(False Claims Act: Presentation of False Claims)
(31 U.S.C. § 3729(a)(1) and 31 U.S.C. § 3729(a)(1)(A))

220.     Relator repeats and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

221.     As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1) and 31 U.S.C. §

54

3729(a)(1)(A).

## THIRD CAUSE OF ACTION

(False Claims Act: Making or Using False
Record or Statement to Cause Claim to be Paid)
(31 U.S.C. § 3729(a)(2) and 31 U.S.C. § 3729(a)(1)(B))

222.    Relator repeats and incorporates by reference the allegations contained in the

preceding paragraphs of this Complaint as if fully set forth herein.

223.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts

alleged herein the Defendants have knowingly made, used, or caused to be made or used, false

records or statements – i.e., the false certifications and representations made or caused to be

made by defendant – material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(2)

and 31 U.S.C. § 3729(a)(1)(B).

## FOURTH CAUSE OF ACTION

(False Claims Act: Making or Using False Record
Or Statement to Avoid an Obligation to Refund)
(31 U.S.C. § 3729(a)(7) and 31 U.S.C. § 3729(a)(1)(G))

224.    Relator repeats and incorporates by reference the allegations contained in the

preceding paragraphs of this Complaint as if fully set forth herein.

225.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts

alleged herein the Defendants knowingly made, used or caused to be made or used false records

or false statements – i.e., the false certifications made or caused to be made by defendant –

material to an obligation to pay or transmit money to the Government or knowingly concealed or

knowingly and improperly avoided or decreased an obligation to pay or transmit money or

property to the Government.

## FIFTH CAUSE OF ACTION

(False Claims Act: Conspiracy)
(31 U.S.C. § 3729(a)(3) and 31 U.S.C. § 3729(a)(1)(C))

226.    Relator repeats and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if full set forth herein.

227.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein the Defendants conspired to make or present false or fraudulent claims, with the specific intent of defrauding the Government, and performed one or more acts to effect payment of false or fraudulent claims.

## SIXTH CAUSE OF ACTION

(California False Claims Act)
(Cal. Govt. Code §§ 12651, *et seq.*)

228.    Relator repeats and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

229.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the California State Government for payment or approval.

230.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the California State Government to approve and pay such false and fraudulent claims.

231.    The California State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continue to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

232.    By reason of the Defendants' acts, the State of California has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

233.    Pursuant to Cal. Govt. Code § 12651(a), the State of California is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## SEVENTH CAUSE OF ACTION

(Florida False Claims Act)
(Fla. Stat. Ann. §§ 68.081, *et seq.*)

234.    Relator repeats and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

235.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Florida State Government for payment or approval.

236.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Florida State Government to approve and pay such false and fraudulent claims.

237.    The Florida State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

238.    By reason of the Defendants' acts, the State of Florida has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

239.    Pursuant to Fla. Stat. Ann. § 68.082(2), the State of Florida is entitled to three

times the amount of actual damages plus the maximum penalty of $11,000 for each and every

false or fraudulent claim, record or statement made, used, presented or caused to be made, used

or presented by Defendants.

## **EIGHTH CAUSE OF ACTION**

(New Jersey False Claims Act)
(N.J. Stat. Ann. §§ 2A:32C-1, *et seq.*)

240.    Relator repeats and incorporates by reference the allegations contained in the

preceding paragraphs of this Complaint as if fully set forth herein.

241.    By virtue of the acts described above, Defendants knowingly presented or caused

to be presented, false or fraudulent claims to the New Jersey State Government for payment or

approval.

242.    By virtue of the acts described above, Defendants knowingly made, used, or

caused to be made or used false records and statements, and omitted and/or falsified material

facts, to induce the New Jersey State Government to approve and pay such false and fraudulent

claims.

243.    The New Jersey State Government, unaware of the falsity of the records,

statements and claims made, used, presented or caused to be made, used or presented by

Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or

conduct of Defendants as alleged herein.

244.    By reason of the Defendants' acts, the State of New Jersey has been damaged, and

continues to be damaged, in substantial amount to be determined at trial.

245.    Pursuant to N.J. Stat. Ann. § 2A:32C-3, the State of New Jersey is entitled to

three times the amount of actual damages plus the maximum penalty allowed under the federal

False Claims Act, 31 U.S.C. § 3729, for each and every false or fraudulent claim, record or

statement made, used, presented or caused to be made, used or presented by Defendants.

## VIII.   DEMANDS FOR RELIEF

**WHEREFORE**, Relator, on behalf of the United States Government, demands judgment against the Defendants, ordering that:

**As to the Federal Claims:**

a.  Pursuant to 31 U.S.C. § 3729(a), Defendants pays an amount equal to three times the amount of damages the United States Government has sustained because of Defendants' actions, plus a civil penalty of not less than $5,000 and not more than $11,000 or such other penalty as the law may permit and/or require for each violation of 31 U.S.C. § 3729, *et seq*, and $50,000 for each violation of 42 U.S.C. § 1320a-7a(a)(7) of the Medicare/Medicaid Anti-Kickback Statute;

b.  Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the False Claims Act and/or any other applicable provision of law;

c.  Relator be awarded all costs and expenses of this action, including attorneys' fees as provided by 31 U.S.C. § 3730(d) and any other applicable provision of the law; and

d.  Relator be awarded such other and further relief as the Court may deem to be just and proper.

**As to the State Claims:**

e.  Relator and each named State Plaintiff be awarded statutory damages in an amount equal to three times the amount of actual damages sustained by each State as a result of Defendants' actions, as well as the maximum statutory civil penalty for each violation by Defendant within each State, all as provided by:

Cal. Govt. Code § 12651;
Fla. Stat. Ann. § 68.082; and
N.J. Stat. Ann. § 2A:32C-3;

f.  Relator be awarded his relator's share of any judgment to the maximum amount

provided pursuant to:

Cal. Govt. Code § 12652(g)(2);
Fla. Stat. Ann. § 68.085; and
N.J. Stat. Ann. § 2A:32C-7;

g.  Relator be awarded all costs and expenses associated with each of the pendent State

claims, plus attorney's fees as provided pursuant to:

Cal. Govt. Code § 12652(g)(8);
Fla. Stat. Ann. § 68.086; and
N.J. Stat. Ann. § 2A:32C-8;

h.  Relator and the State Plaintiffs be awarded such other and further relief as the Court

may deem to be just and proper.

## TRIAL BY JURY

Relator hereby demands a trial by jury as to all issues.

Dated:  January 26, 2017             */s/ Jeffrey S. Goddess*

_____
Jeffrey S. Goddess (No. 630)
P. Bradford deLeeuw (Del. Bar No. 3569)
ROSENTHAL, MONHAIT & GODDESS, P.A.
919 N. Market Street, Suite 1401
P.O. Box 1070
Wilmington, DE  19899-1070
jgoddess@rmgglaw.com
bdeleeuw@rmgglaw.com
302-656-4433

David S. Stone (admitted *pro hac vice*)
Robert A. Magnanini
Amy Walker Wagner
STONE & MAGNANINI LLP
100 Connell Drive, Suite 2200
Berkeley Heights, NJ 07922
973-218-1111

*Attorneys for Relator*

60